UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

NELSON ALGARIN,

                        Plaintiff,                                Index No. 22-CV-8340

  -against-

NYC HEALTH + HOSPITALS CORPORATION,           **COMPLAINT**

                        Defendants.
------------------------------------------------------------------------X

        Plaintiff Nelson Algarin ("Plaintiff" or "Mr. Algarin"), files this action against NYC Health + Hospitals Corporation on the grounds set forth as follows:

### NATURE OF ACTION

        1.     This action for damages and declaratory relief seeks redress after Defendant NYC Health + Hospitals Corporation ("H+H") placed Plaintiff on unpaid administrative leave and ultimately, terminated Mr. Algarin's employment in violation of 42 U.S.C. § 1983, the First and Fourteenth Amendments to the Constitution of the United States, and Title VII of the Civil Rights Act of 1964, New York State Executive Law, title 8 *et seq.*, and New York City Administrative Code Title 8, *et seq.*

        2.     As explained more fully below, H+H not only correctly determined Mr. Algarin's religious beliefs prohibiting compliance with H+H's mandatory COVID-19 vaccination policy were sincere; H+H also demonstrated that accommodating Mr. Algarin did not result in undue hardship. Despite this, and absent any material change in circumstances, H+H invoked its unconstitutional and religiously discriminatory mandatory vaccination policy and revoked Mr. Algarin's reasonable religious accommodation, placed Mr. Algarin on unpaid leave, and thereafter, terminated his employment.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

3. On February 8, 2022, Mr. Algarin timely filed a charge of discrimination with the Equal Opportunity Employment Commission ("EEOC") on the basis of religious discrimination.

4. On July 1, 2022, the EEOC issued Mr. Algarin his right-to-sue letter, providing that Mr. Algarin had 90 days to commence a civil action in federal court. *See* Exhibit 1.

**JURISDICTION AND VENUE**

5. This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. § 1983. This action also arises under federal statutory laws, namely 42 U.S.C. § 1985(3) and 42 U.S.C. § 2000e-2.

6. This Court has jurisdiction over the instant matter pursuant to 28 U.S.C. §§ 1331 and 1343.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District and H+H maintains its principal place of business in this district.

8. This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, implemented through Rule 57 of the Federal Rules of Civil Procedure.

9. This Court is authorized to grant Plaintiffs' prayer for temporary, preliminary, and permanent injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

10. This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, pursuant to 42 U.S.C. § 1988.

**PARTIES**

11. Plaintiff Nelson Algarin is an internet technology ("IT") professional and former H+H employee who holds the sincere religious belief that he cannot be inoculated with vaccines – including all available COVID-19 vaccines – that were tested, developed or produced with fetal cell lines derived from procured abortions.

12. Defendant NYC Health + Hospitals is a New York corporation and Mr. Algarin's former employer. At all times relevant, H+H employed more than fifteen (15) employees and is therefore subject to Title VII, which mandates employers (such as H+H) reasonably accommodate an employee's (such as Mr. Algarin) sincerely held religious beliefs.

**STATEMENT OF FACTS**

**A. BACKGROUND**

13. For more than 32 years, Mr. Nelson dutifully served H+H as an IT professional whose work was integral in ensuring H+H maintained a well-operated and secure health system. While Mr. Nelson had no contact with patients or healthcare professionals during his employ leading up to and throughout the pandemic, his work was essential to the functionality of H+H's medical facilities.

14. Towards the end of March 2020, H+H informed Mr. Nelson that the effects of COVID-19 had continued to increase in severity and as a result, Mr. Nelson submitted a request to exercise the time off he had accrued throughout his more than three-decade career at H+H. His request was subsequently approved.

15. Fast forward to December 2020, Mr. Nelson and resumed performing his duties as he had since 1989 without incident. Each day he was scheduled to work, Mr. Nelson would park his vehicle in the parking garage, enter the facility through the back entrance to the floors, scan his

employee ID to access the door leading to the stairwell, which he climbed to his floor. Once on his floor, he completed a Point of Entry Screening and was thereafter immediately permitted to enter H+H's IT department suite.

16. Due to outsourcing and downsizing, Mr. Nelson only had two co-workers. During his shift from 4:00 p.m. – 12:00 a.m., Mr. Nelson worked exclusively from his cubicle and did not come into close proximity or contact with his co-workers. The IT Department doors remained closed at all times.

17. From December 2020 through August 2021, Mr. Nelson continued to work under the aforesaid conditions and in the aforesaid manner, without incident. Despite posing no risk to H+H staff or patients, H+H abruptly implemented a weekly COVID-19 testing requirement in August 2021. Mr. Nelson complied with the weekly testing requirement for weeks without incident.

18. The next month, H+H again abruptly and arbitrarily modified its policy and imposed a mandatory COVID-19 vaccination requirement as a condition of employment.

19. On September 8, 2021, H+H informed Mr. Nelson that he had to become "fully vaccinated" against COVID-19 in order to maintain his employment. But unlike the weekly testing requirement with which Mr. Nelson willingly complied without question or incident, the requirement that Mr. Nelson be vaccinated against COVID-19 was a condition of employment with which he could *not* comply.

20. As a practicing Christian, Mr. Nelson's sincerely held religious beliefs prevent him from receiving a COVID-19 vaccine that was tested, developed, or produced with fetal cell lines derived from procured abortions. Mr. Nelson promptly informed H+H of his religious beliefs and submitted a religious accommodation request the day after learning of H+H's policy change.

4

21. In his request, Mr. Algarin explained that, while his sincerely held religious beliefs precluded his ability to comply with H+H's mandatory vaccination policy, Mr. Nelson could be accommodated – and he was willing to be accommodated – by and through a weekly COVID-19 testing requirement identical to that which H+H had previously imposed for weeks.

22. Not only is Mr. Nelson's proposed weekly testing accommodation undoubtedly reasonable as evidenced by H+H's own decision to previously implement such a policy, but also, a weekly testing accommodation proved to wholly satisfy the interest H+H sought to achieve through its mandatory vaccination policy–the mitigation of the contraction and transmission of COVID-19.

23. Understanding the sincerity of his religious beliefs, the efficacy of the proposed weekly testing reasonable accommodation, and acknowledging that the weekly testing reasonable accommodation did not cause H+H any undue hardship, H+H approved Mr. Nelson's reasonable accommodation request permitted him to continue working under the condition that he test once a week. But this was short lived.

24. On September 14, 2021, H+H advised Mr. Nelson that, despite already granting his request for a reasonable accommodation, H+H would be revoking his reasonable accommodation and placing him on unpaid leave because "[H+H] records indicate that [Mr. Nelson] had not complied with the NYS Mandate Covid-19 Vaccination [*sic*]." The "NYS Mandate Covid-19 Vaccination" H+H references is N.Y. Comp. Codes R. & Regs. tit. 10, § 2.61 ("Section 2.61").

25. Revoking an approved religious accommodation that does not impose an undue hardship is unlawful and violates Title VII.

26. Reliance on Section 2.61 to revoke an approved religious accommodation that does not impose an undue hardship is unlawful and violates Title VII.

27. The Second Circuit has expressly held that Section 2.61 permits "employers to make other accommodations for individuals who choose not to be vaccinated based on their sincere religious beliefs." *See We the Patriots USA, Inc. et al.//Dr. A. et al., v. Hochul*, Nos. 21-2179, 21-2566 (2nd Cir. Oct. 29, 2021). Thus, H+H cannot assert that, based on Section 2.61, it was obligated to revoke Mr. Nelson's reasonable religious accommodation (weekly testing).

28. To the extent H+H argues it did not revoke Mr. Nelson's reasonable religious accommodation but rather, H+H "substituted" weekly testing in lieu of placing him on unpaid leave, such basis is insufficient to make lawful H+H's actions in doing so.

29. Unpaid leave does not constitute an accommodation.

30. To the extent being placed on leave is an "accommodation", Title VII requires that the provision of accommodations be *reasonable*.

31. It is unreasonable to place Mr. Algarin on *unpaid* leave because he is religious because there is no logical, legal, causal, or scientific relationship between the electronic transfer of funds from H+H's bank account to Mr. Nelson's bank account in accordance with the terms set forth in Mr. Nelson's employment agreement and the mitigation of the contraction and transmission of COVID-19.

32. The absence of any relationship between whether Mr. Nelson was paid or unpaid while on leave bears no weight on the interest H+H sought to effectuate through its mandatory COVID-19 vaccination policy.

33. Even neutral policies[1] must be adjusted to ensure their application does not disfavor a person based upon his or her religion, a neutral policy must "give way to" religious practice. *Abercrombie*, 575 U.S. at 775, 135 S. Ct. 2028.

---

[1] Mr. Nelson does not concede that H+H's mandatory vaccination policy is neutral; this is pled assuming *arguendo*.

34. Revocation of Mr. Nelson's pay constitutes "disfavorable" treatment.

35. Mr. Nelson was both willing and able to work, and, as evidenced by H+H's own provision of weekly testing as a reasonable accommodation to Mr. Nelson, H+H is able to reasonably accommodate Mr. Nelson without suffering an undue hardship.

36. From the date H+H provided Mr. Nelson with the aforesaid reasonable accommodation to the date H+H revoked Mr. Nelson's reasonable accommodation and placed him on unpaid leave, all material facts and circumstances remained unchanged.

37. On September 15, 2021, the day after Mr. Nelson learned his reasonable religious accommodation was to be revoked, H+H sent a follow-up correspondence again reiterating that H+H decided to place Mr. Nelson on unpaid leave because he "failed to comply with the New York State Vaccine Mandate" – a colloquial reference to Section 2.61.

38. But Section 2.61 is inapplicable and in no way compels H+H to take such unlawful action. Despite this, and notwithstanding the unlawful nature of placing Mr. Nelson on unpaid leave in violation of Title VII, H+H placed Mr. Nelson on unpaid leave on September 27, 2021.

**B.  H+H CANNOT RELY ON SECTION 2.61 TO JUSTIFY VIOLATING TITLE VII.**

39. On September 15, 2021, H+H itself acknowledged "[a] federal court in the Northern District of New York [ ] directed the State Department of Health to end the component of the vaccine mandate that allows employers not to consider religious exemptions for health care workers . . . [and] this decision is limited to the issue of religious accommodations." *See Dr. A v. Hochul, et al.*, No. 21-2566 (N.D.N.Y. Sep. 14, 2021) (Order granting TRO).

40. Despite acknowledging Section 2.61 had no effect, H+H reiterated it did not care and that it would continue to violate Title VII, and sent Mr. Algarin a "Relief From Duty Advanced Notice" which states in pertinent part:

> Be advised that our records indicate that **you have not complied with [Section 2.61]. Therefore, . . . you will be relieved from duty without pay** until your compliance with [Section 2.61].

41. Boiled down to its essence, H+H acknowledged that it was aware Section 2.61 did not prohibit employers from considering religious accommodations, and even if it did, Section 2.61 was unenforceable pursuant to a N.D.N.Y. Court order. Then, *just hours later*, H+H cited Mr. Nelson's failure to comply with Section 2.61 as the basis upon which he was being placed on unpaid leave.

42. On September 15, 2021, H+H placed Mr. Algarin on unpaid leave.

43. On November 16, 2021, H+H advised Mr. Algarin that his "accommodation" (unpaid leave) was set to expire on November 26, 2021 and Mr. Algarin could either violate his sincerely held religious beliefs or voluntarily resign; otherwise, his third "option" – termination of employment – would take effect on November 29, 2021.

44. On November 23, 2021 and in response to H+H's November 16, 2021 correspondence, Mr. Algarin submitted a request for a reasonable accommodation based on his sincerely held religious beliefs, which if approved, would take effect on November 26, 2021.

45. H+H ignored Mr. Algarin's November 23, 2021 religious accommodation request, did not review his request, did not respond to his request, or even acknowledge his request. Instead, H+H terminated Mr. Algarin on November 29, 2021.

**COUNT I – 42 U.S.C. §§ 2000e *et seq.*  
Religious Discrimination  
Violation of Title VII**

46. Mr. Algarin re-alleges and incorporates by reference all preceding paragraph as if fully set forth herein.

47. Mr. Algarin sincerely holds religious beliefs and is thus, a member of a protected class.

48. Mr. Algarin is an employee and H+H is an employer as intended by Title VII.

49. H+H had actual knowledge of Mr. Algarin's sincerely held religious beliefs, and such knowledge is based upon multiple correspondences referencing his approved religious accommodation and H+H's actions in providing Mr. Algarin a reasonable religious accommodation, prior to revoking it.

50. Mr. Algarin experienced adverse employment action and a materially adverse change in the terms and conditions of his employment – namely, being placed on unpaid leave and the termination of his employment – because of his sincerely held religious beliefs.

51. At all times relevant, Mr. Algarin is qualified to perform the essential functions of his job if provided a reasonable accommodation by H+H.

52. H+H knowingly, intentionally, recklessly, negligently, or by gross negligence, discriminated against Mr. Algarin because of his sincerely held religious beliefs by failing or refusing to provide him with a reasonable accommodation and instead, terminating his employment.

53. Providing a reasonable religious accommodation to Mr. Algarin would not cause H+H to suffer an undue hardship as evidenced by H+H previously providing Mr. Algarin a reasonable religious accommodation identical to the reasonable religious accommodation Mr. Algarin sought at all times relevant.

54. All allegations set forth herein constitute a failure to accommodate.

55. All allegations set forth herein constitute a violation of Title VII.

56. As a direct and proximate result of H+H's actions or omissions, Mr. Algarin sustained pecuniary and non-economic injuries in an amount that exceeds $75,000.00, including lost wages, benefits, retirement funds, the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, attorneys' fees, and costs associated with this action.

### COUNT II – 42 U.S.C. § 1983
### Violation of Free Exercise
### First Amendment to the U.C. Constitution

57. Mr. Algarin re-alleges and incorporates by reference all preceding paragraph as if fully set forth herein.

58. The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging Mr. Algarin's rights to free exercise of religion.

59. Mr. Algarin has sincerely held religious beliefs that compel him to refuse vaccination involving abortion-connected vaccines.

60. H+H's mandatory vaccination policy, on its face and as applied, targets Mr. Algarin's sincerely held religious beliefs by requiring the revocation of religious accommodations previously granted or refusing to review religious accommodation requests on the basis that Section 2.61 permits or requires that H+H to reject all religious accommodation requests submitted by its employees.

61. H+H's mandatory vaccination policy, on its face and as applied, impermissibly burdens Mr. Algarin's sincerely held religious beliefs, compels him to abandon his sincerely held religious beliefs or violate them under coercion, and forces Mr. Algarin to choose between his

religious convictions and H+H's unconstitutional refusal to permit Mr. Algarin to maintain his employment unless he abandons his sincerely held religious beliefs.

62. H+H's mandatory vaccination policy strips Mr. Algarin of the fundamental right to freely exercise his religion and obtain a reasonable accommodation in light of his sincerely held religious beliefs.

63. H+H's mandatory vaccination policy, on its face and as applied, placed Mr. Algarin in an irresolvable conflict between compliance with the H+H's policy and upholding his sincerely held religious beliefs.

64. H+H's mandatory vaccination policy, on its face and as applied, put substantial pressure on Mr. Algarin to violate his sincerely held religious beliefs or lose his occupation, his ability to support his family, and the loss of benefits and retirement-related funds due to him in the near future.

65. H+H's mandatory vaccination policy, on its face and as applied, is neither neutral nor generally applicable as it grants the possibility of medical *exemptions* for reasons of secular "health" but bars religious accommodations despite religious accommodations being even more closely tailored to policy compliance based on an alternative mitigation measure as opposed to an exemption which does *not* require or impose an alternative mitigation measure at all.

66. H+H's mandatory vaccination policy, on its face and as applied, targets Mr. Algarin because of his sincerely held religious beliefs and subjected him to disparate and discriminatory treatment.

67. H+H's mandatory vaccination policy, on its face and as applied, creates a system of individualized exemptions without any alternative mitigation measure required on the basis of physical health, while H+H's mandatory vaccination policy discriminates against requests for

accommodations which *do* impose an alternative mitigation measure when such accommodations are based upon spiritual health and sincerely held religious beliefs.

68. H+H's mandatory vaccination policy, on its face and as applied, discriminates on the basis of religion and infringes on Mr. Algarin's fundamental right to free exercise because members of other protected classes (i.e., disability) *exempt* from compliance while religious persons are not even afforded an *accommodation* to the policy.

69. There is no legitimate, rational, or compelling interest sought or achieved by H+H's mandatory vaccination policy prohibiting the provision of reasonable religious accommodations while contemporaneously permitting disabled persons to remain entirely exempt absent any other mitigation measures in place, especially given that: (a) those exempted for reasons of "health" are no less susceptible of contracting and spreading COVID (the prevention of which is the very reason for the Vaccine Mandate) than those who would be exempted for reasons of religion (b) that the available COVID-19 vaccines are clearly failing to prevent transmission or infection, so that "booster shots" are now being promoted; (c) even the vaccinated must continue to wear masks as if they were not vaccinated because they can still be infected or infect others; (d) that naturally immune persons who have recovered from COVID have superior immunity and do not need vaccination; (e) that vaccinating naturally immune people may harm them by causing a hyperimmune response; and (f) that vaccinated persons are being admitted to the hospital along with unvaccinated persons.

70. H+H's mandatory vaccination policy is not the least restrictive means of mitigating the contraction and transmission of COVID-19 because this interest can be achieved and has been achieved by alternate mitigation measures, including masking, testing, quarantining.

71. H+H's mandatory vaccination policy, on its face and as applied, has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship to Mr. Algarin insofar as he has been terminated from his employment.

72. As a direct and proximate result of H+H's actions or omissions, Mr. Algarin sustained pecuniary and non-economic injuries in an amount that exceeds $75,000.00, including lost wages, benefits, retirement funds, the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, attorneys' fees, and costs associated with this action.

73. Mr. Algarin has no adequate remedy at law to redress H+H's deprivation of his rights under the Free Exercise Clause.

**COUNT III – 42 U.S.C. § 1983**
**Violation of Equal Protection**
**Fourteenth Amendment to the U.S. Constitution**

74. Mr. Algarin re-alleges and incorporates by reference all preceding paragraph as if fully set forth herein.

75. The Fourteenth Amendment to the United States Constitution guarantees Mr. Algarin's right to equal protection under the law.

76. H+H's mandatory vaccination policy, on its face and as applied, is an unconstitutional abridgment of Mr. Algarin's right to equal protection, is not neutral, and specifically targets Mr. Algarin because of his sincerely held religious beliefs, and as a result, subjects Mr. Algarin to discriminatory and unequal treatment insofar as H+H refuses to merely accommodate Mr. Algarin while *exempting* disabled persons. In doing so, H+H is giving preferential treatment to disabled persons while exhibiting anti-religion based sentiments and otherwise discriminating against religious persons.

77. H+H's mandatory vaccination policy, on its face and as applied, is an unconstitutional abridgement of Mr. Algarin's right to equal protection because H+H treated Mr. Algarin differently from similarly situated healthcare workers solely on the basis of Mr. Algarin's religion.

78. H+H's mandatory vaccination policy, on its face and as applied, singles out Mr. Algarin for selective treatment based upon his sincerely held religious objections to the COVID-19 vaccines.

79. H+H's mandatory vaccination policy, on its face and as applied, creates a system of classes and categories that improperly *exempt* disabled persons while not even providing mere *accommodations* to religious persons. In doing so, H+H is demonstrating its preferential treatment of disabled persons while contemporaneously exhibiting its anti-religious sentiment and disparate treatment towards religious persons, such as Mr. Algarin.

80. H+H's mandatory vaccination policy runs contrary to well-established state and federal law and arbitrarily and capriciously deprives religious persons such as Mr. Algarin from the religious protections afforded to him under the U.S. Constitution, Title VII, the Human Rights Law of the State of New York and the Human Rights Law of the City of New York, while leaving untouched protections under the same statutes for other protected classes, including even permitting exemptions for disabled persons.

81. H+H's mandatory vaccination policy attempts to usurp the rights to religious accommodations afforded to Mr. Algarin under both state and federal law and the laws of New York City by singling Mr. Algarin out for disparate treatment whiles providing even more leniency and differential treatment for disabled persons who wish not to be vaccinated against COVID-19.

82. There is no rational, legitimate, or compelling interest in H+H's mandatory vaccination policy's application of different standards to different, similarly situated groups, especially whereas Mr. Algarin is not even in contact or close proximity to H+H healthcare workers or patients.

83. H+H's mandatory vaccination policy, on its face and as applied, discriminates between religion and nonreligion by allowing nonreligious *exemptions* to its mandatory vaccination policy while not even permitting religious *accommodations* to the exact same policy.

84. H+H's mandatory vaccination policy, on its face and as applied, is a "status-based enactment divorced from any factual context" and "a classification of persons undertaken for its own sake," which "the Equal Protection Clause does not permit." *Romer v. Evans*, 517 U.S. 620, 635 (1996). H+H's mandatory vaccination policy, on its face and as applied, "identifies persons by a single trait [religious beliefs] and then denies them protections across the board." *Id*. at 633.

85. H+H's mandatory vaccination policy, on its face and as applied, by allowing medical exemptions while denying religious accommodations, is a "disqualification of a class of persons from the right to seek specific protection [for their religious beliefs]." *Id*.

86. "A law [or policy] declaring that in general it shall be more difficult for one group of citizens than for all others to seek [an accommodation to a mandatory vaccination policy] is itself a denial of equal protection of the laws in the most literal sense." *Id*. H+H's mandatory vaccination policy, on its face and as applied, is such a measure.

87. H+H's mandatory vaccination policy, on its face and as applied, has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship to Mr. Algarin insofar as he was terminated from his employment.

88. As a direct and proximate result of H+H's actions or omissions, Mr. Algarin sustained pecuniary and non-economic injuries in an amount that exceeds $75,000.00, including lost wages, benefits, retirement funds, the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, attorneys' fees, and costs associated with this action.

89. Mr. Algarin has no adequate remedy at law to redress H+H's deprivation of his rights under the Equal Protection Clause.

### COUNT IV – New York State Executive Law § 296 *et seq.*
### Religious Discrimination
### Violation of New York State Law

90. Mr. Algarin re-alleges and incorporates by reference all preceding paragraph as if fully set forth herein.

91. Executive Law §296 provides that "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

92. Further, New York State Executive Law §296(6) further provides that "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

93. Further, New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section

applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

94. H+H engaged in an unlawful discriminatory practice by refusing to provide Mr. Algarin a reasonable religious accommodation and otherwise discriminating against Mr. Algarin because of his religion.

95. H+H also engaged in an unlawful discriminatory practice by aiding, abetting, compelling and/or coercing the discriminatory behavior as stated herein.

96. H+H also engaged in an unlawful discriminatory practice by wrongfully retaliating against Mr. Algarin.

97. Mr. Algarin hereby makes a claim against H+H under all of the applicable paragraphs of New York State Executive Law § 296.

98. As a direct and proximate result of H+H's actions or omissions complained of herein, and in violation of New York State Law, Mr. Algarin sustained pecuniary and non-economic injuries in an amount that exceeds $75,000.00, including lost wages, benefits, retirement funds, the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, attorneys' fees, and costs associated with this action.

**COUNT V – NYC Admin. Code §8-107 *et seq.*
Religious Discrimination
Violation of New York City Administrative Code**

99. Mr. Algarin re-alleges and incorporates by reference all preceding paragraph as if fully set forth herein.

100. Further, NYC Admin. Code § 8-107(1)(e) provides that it shall be unlawful discriminatory practice: "For an employer . . , to discharge . . . or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter. . . "

17

101. Further, NYC Admin. Code § 8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

102. Further, NYC Admin. Code §8-107(19), provides that "It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section."

103. Further, NYC Admin. Code § 8-107(13) provides that "[a]n employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section." b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where: (1) the employee or agent exercised managerial or supervisory responsibility; or (2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or (3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

104. H+H engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Tide 8, §8-107(1)(e) by discriminating against Mr. Algarin because of his opposition to H+H's unlawful employment practices, as evidenced by his renewed religious

accommodation request submitted on or about November 23, 2021 prior to his termination and his exercise of due process rights as evidenced by filing a formal charge of discrimination with the EEOC prior to his termination.

105.  H+H also engaged in an unlawful discriminatory practice in violation of NYC Admin. Code §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

106.  H+H also engaged in unlawful discriminatory practice in violation of NYC Admin. Code §8-107(19) for the aforesaid reasons and by engaging in the aforesaid conduct alleged herein.

107.  H+H also engaged in unlawful discriminatory practice in violation of NYC Admin. Code §8-107(13) for the aforesaid reasons and by engaging in the aforesaid conduct alleged herein.

108.  Mr. Algarin hereby makes a claim against Defendants under all of the applicable paragraphs of New York City Administrative Code Title 8.

109.  As a direct and proximate result of H+H's actions or omissions complained of herein, and in violation of the New York City Administrative Code, Mr. Algarin sustained pecuniary and non-economic injuries in an amount that exceeds $75,000.00, including lost wages, benefits, retirement funds, the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, attorneys' fees, and costs associated with this action.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Algarin respectfully prays that this Honorable Court enter judgment in Plaintiff's favor, and award Plaintiff such relief as to make Plaintiff whole and remedy the aforesaid violations; and hold NYC Health + Hospitals liable and in doing so, award all legal and equitable relief provided by law, including but not limited to:

a. Injunctive relief providing Mr. Algarin with a reasonable accommodation and otherwise non-hostile work environment;

b. Declaratory relief finding H+H's mandatory vaccination policy unconstitutional;

c. Compensatory damages for past and future economic injuries in an amount in excess of $75,000.00;

d. An award of reasonable attorney's fees and litigation costs pursuant to 42 U.S.C. § 1988; and

e. Any such other relief this Honorable Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated: September 29, 2022.

Respectfully submitted,

By: /S/ DAVID M. ENGELHARDT
David Engelhardt [5276084]
ENGELHARDT LAW P.C.
50 Pine Street #7S
New York, NY 10005
Tel: (917) 336-9800
david@engelhardtlaw.co


By: /S/ MICHAEL A. YODER
Michael A. Yoder* [VSB 93863]
THE LAW OFFICE OF MICHAEL A. YODER, PLLC
2300 Wilson Blvd., Suite 700
Arlington, VA 22202
Tel: (571) 234-5594
Fax: (571) 327-5554
michael@yoderesq.com
*Pro hac vice forthcoming*

*Counsel for Plaintiffs*